UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| ANDRES QUINTANA, and JANE | ) | CASE NO. 20-02391-5-SWH |
| QUINTANA, | ) | |
| DEBTORS. | ) | |
| | ) | |
| | ) | |
| PW FUNDING, LLC, | ) | ADVERSARY PROCEEDING NO. |
| PLAINTIFF, | ) | |
| | ) | _____ |
| v. | ) | |
| | ) | |
| JANE QUINTANA, | ) | |
| DEFENDANT. | ) | |
| | ) | |

## COMPLAINT

Plaintiff-Creditor PW Funding, LLC ("Plaintiff"), by and through its undersigned

attorneys, files this Complaint objecting to the Defendant-Debtor Jane Quintana's ("Defendant"

or "Quintana") discharge, and respectfully represents and alleges as follows:

### NATURE OF ADVERSARY PROCEEDING

1.      This is an adversary proceeding in which the Plaintiff seeks a determination under

11 U.S.C. § 523(a)(4) as to the dischargeability of certain debts, owed by the Defendant to the

Plaintiff.

2.      Plaintiff seeks an order denying the dischargeability of its claims with the

Defendant, plus compensatory damages in excess of applicable jurisdictional thresholds, punitive

damages, and attorneys' fees and costs arising from the various unlawful acts of Defendant

detailed herein.

### PARTIES, JURISDICTION, AND VENUE

3.      Plaintiff is a Georgia limited liability company, with a principal office address of 3300 Highlands Pkwy. SE, Suite 290, Smyrna, GA 30082.

4.      Quintana is a natural person residing at 8705 Kimalden Court, Wake Forest, NC 27587 Georgia and can be served with process at the same address.

5.      On July 1, 2020, Defendant filed a petition for relief under Chapter 7 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of North Carolina, Case No. 20-02391-5-SWH.

6.      As of the date of this Complaint, Defendant has not been granted a discharge.

7.      This Complaint is timely as the deadline to determine the dischargeability of debts is set for September 25, 2020, as described in the Notice of Chapter 7 Bankruptcy Case, and the date of this filing is prior to the deadline's expiration.

8.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1331 and 1334 because this adversary proceeding arises in, arises under, and is related to the above captioned Chapter 7 case pending in this Court.

9.      This Court has personal jurisdiction over the Defendant pursuant to Federal Rule of Bankruptcy Procedure 7004(f).

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

11.     This case is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (E), and (I).

## FACTS

12.     Plaintiff claims arise out of a financial transaction and subsequent action under the control and or direction of Defendant, including failing to pay monies due and owing, a failure of fiduciary duties, and fraudulent misrepresentations by Defendant.

13.     Quintana is the owner, sole shareholder, agent, and representative of Jane Quintana, D.M.D., P.A. ("Wake Forest Smiles").

14.     Wake Forest Smiles primarily operates as a dental practice, performing a variety of dental services.

15.     In return for such services, Wake Forest Smiles either receives payment from the patients or the patient's insurance company.

16.     On or about April 25, 2019, Plaintiff and Wake Forest Smiles entered into a Receivables Purchase and Sale Agreement ("Agreement") whereby Plaintiff purchased $402,000.00 of Wake Forest Smiles' current and future receivables.  A true and accurate copy of the Agreement is attached hereto as Plaintiff's Exhibit A.

17.     On or about April 25, 2019, Plaintiff and Quintana entered into a guaranty ("Guaranty") whereby Quintana guaranteed to Plaintiff "the prompt payment and performance of all debts, obligations, liabilities and undertakings" due to Plaintiff under the Agreement by Wake Forest Smiles.  A true and accurate copy of the Guaranty is incorporated into the Agreement attached hereto as Plaintiff's Exhibit A.

18.     Quintana, as Wake Forest Smiles' owner and agent, carried out all negotiations and provided all representations described herein.

19.     Pursuant to the Agreement, Wake Forest Smiles granted to Plaintiff a security interest in various forms of property that are detailed more specifically therein.

20.     In order to induce Plaintiff into the Agreement, Wake Forest Smiles and Quintana made numerous representations in the Disclosure Questionnaire ("Questionnaire"). A true and accurate copy of the Questionnaire is attached hereto as Plaintiff's Exhibit B.

21.     One such representation by Quintana and Wake Forest Smiles was that neither the company nor any owner had any federal, state, or tax liabilities or liens outstanding or expected to be filed.

22.     Another such representation by Quintana and Wake Forest Smiles was that Wake Forest Smiles was not involved in any current or threatened litigation.

23.     An additional representation by Quintana and Wake Forest Smiles was that Wake Forest Smiles was not in default of any existing indebtedness.

24.     Quintana and Wake Forest Smiles also represented that the Agreement and Guaranty were being entered into for business purposes.

25.     These representations were made to induce Plaintiff to enter into the Agreement and Guaranty.

26.     Plaintiff reasonably relied upon Wake Forest Smiles and Quintana's representations.

27.     Before and during the application process for the Agreement, Wake Forest Smiles and Quintana knew that the company and or owners had outstanding federal, state, and tax liabilities or liens expected to be filed, that the company was involved in current or threatened litigation, and that the company was currently behind and or in default of certain obligations.

28.     On information and belief, Quintana utilized the monies received by the Agreement for personal purposes, including facilitating the purchase of residential real property for her primary residence that closed approximately three months after the Agreement.

29.     Pursuant to the Agreement, Wake Forest Smiles, through its owner and CEO Quintana, represented, warranted, and covenanted that all information provided by it in connection with the execution of the Agreement was true, accurate and complete in all respects.

30.    The information provided by Wake Forest Smiles in the execution of the Agreement was not true, accurate, or complete.

31.    Wake Forest Smiles breached the Agreement and is in default as a result of the foregoing including making false statements.

32.    Pursuant to the Agreement and in the event of default, Plaintiff is entitled to all remedies available under law and equity, including the right to certain amounts described as Specified Amount of the Purchased Receivables.

33.    Wake Forest Smiles further promised to pay all reasonable attorneys' fees to enforce Plaintiff's rights and remedies under the Agreement.

34.    Pursuant to the Agreement, the Specified Amount of the Purchased Receivables bears interest at either eighteen percent per annum or the maximum amount of interest allowed by law, whichever is lower.

35.    Upon Wake Forest Smiles' default, Quintana, by his guaranty, is obligated to promptly pay any debt or liability owed by Wake Forest Smiles.

36.    Quintana has refused to pay the amounts due and owing, thereby breaching and defaulting on the Guaranty.

37.    Quintana and Wake Forest Smiles were notified of the breaches and default.

38.    Despite notice of the default and breach, the Defendant refused to pay past due amounts.

39.    As of April 24, 2020, Plaintiff had sustained damages in the amount of $217,080.00 proximately caused by Quintana's breach of the Guaranty.

40.    Plaintiff has sustained damages in an amount to be determined proximately caused by Quintana's fraudulent misrepresentations.

41.     At various times, Quintana has placed or removed monies from Wake Forest Smiles or utilized the monies contrary to the obligations of the Agreement, monies that were owed to Plaintiff, and used them for her personal gain.

42.     Plaintiff has also engaged counsel to represent it in this matter, incurring attorneys' fees and costs to enforce the Agreement.  Defendant is obligated to pay attorneys fees and costs pursuant to contract and as allowed by law.

43.     Plaintiff has performed any and all conditions and obligations required of it under the terms of the aforementioned Guaranty prior to bringing this lawsuit.

**<u>FIRST CLAIM FOR RELIEF // 11 U.S.C. § 523(a)(2)</u>**

44.     Except to the extent inconsistent with the relief in this count, Plaintiff incorporates by reference the allegations set forth in paragraphs 1 – 43 as if set forth at length herein.

45.     Defendant made numerous false statements or representations to Plaintiff as described herein through the Questionnaire and the Agreement executed by Wake Forest Smiles by its owner and agent Quintana.

46.     The Defendant has committed fraud against Plaintiff.

47.     The Defendant made false statements or representations.

48.     The Defendant knew of the falsity of these statements or representations.

49.     The Plaintiff was unaware of the falsity of these statements or representations.

50.     The Plaintiff relied on the statements or representations and if it had known, the Plaintiff would not have provided a benefit to Wake Forest Smiles and the Defendant.

51.     The Defendant made these statements or representations with the intent to deceive the Plaintiff into purchasing the receivables referenced above.

52.     As a direct and proximate result of the fraudulent conduct of Defendant, Plaintiff has sustained damages as alleged herein or in such other amount as may be proved at trial.

53.     The acts of the Defendant in committing the fraud alleged herein were intentional and designed to harm the Plaintiff in order to obtain benefits to which the Defendant would not otherwise be entitled; as a result of which, Plaintiff is entitled to recover exemplary or punitive damages in addition to all other amounts recover herein.

54.     The debt alleged herein constitutes a debt for property obtained by false pretenses, false representations, or actual fraud upon which Plaintiff reasonable relied within the meaning of 11 U.S.C. § 523(a)(2) and is nondischargeable.

## SECOND CLAIM FOR RELIEF // 11 U.S.C. § 523(a)(4)

55.     Except to the extent inconsistent with the relief in this count, Plaintiff incorporates by reference the allegations set forth in paragraphs 1 – 43 as if set forth at length herein.

56.     An individual debtor should not receive a discharge from any debt in which there was fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.  11 U.S.C. § 523(a)(4).

57.     The debt owed to Plaintiff is not dischargeable under 11 U.S.C. § 523(a)(4) because the Defendant was responsible for the defalcation of Plaintiff's assets held in trust while the Defendant was acting in a fiduciary capacity.

58.     Defendant exercised "authority or control over the management or the disposition" of certain assets of the Plaintiff that Plaintiff purchased or has a security interest therein.

59.     Defendant, contrary to the agreed terms in the Agreement, determined whether or not the property held in trust was to be turned over to Plaintiff. Defendant, also unilaterally and contrary to the agreed terms in the Agreement, determined whether or not the Plaintiff could retrieve its contractually due payments of the property held in trust.

60.     The Defendant was authorized to sign or cause to be signed most or all of the corporate checks, including the checks payable to the Plaintiff.

61.     The Defendant had authority and control over the management and disposition of assets belonging to the Plaintiff.

62.     Defendant directed money from one account of Wake Forest Smiles to another in an effort to convert monies owed to Plaintiff.

63.     Consequently, the Defendant's use of those assets to pay other creditors, parties, or herself, rather than allowing the Plaintiff to withdraw the amounts held in trust due and owing is a fraud perpetrated on Plaintiff.   Defendant's control over the accounts meant that she "exercise[d] … authority or control respecting … disposition of assets," and is a fiduciary for purposes of imposing personal liability.

64.     By exercising control over assets belong to the Plaintiff, the Defendant is a fiduciary with respect to said assets.

65.     By exercising control over the assets of the Plaintiff for the Defendant' own use, the Defendant fiduciary has breached the fiduciary obligations owed to the Plaintiff.

66.     Defendant is individually liable to make restitution to the Plaintiff.

67.     By failing to make required payment to the Plaintiff, the fiduciary Defendant has deprived the Plaintiff of assets belonging to the Plaintiff.

68.     The Plaintiff has suffered harm and damages related to the Defendant's breach of the fiduciary duties owed.

69.     Plaintiff is informed and believes, and on that basis, alleges that the conduct of the Defendant was intentional, malicious, done for the express purpose of causing financial harm to the Plaintiff, and a defalcation of fiduciary duty, sufficient to warrant an award of exemplary or punitive damages from the Defendant in an amount according to proof at trial.

70.     The debt alleged herein constitutes actual fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny, within the meaning of 11 U.S.C. § 523(a)(4) and is nondischargeable.

### THIRD CLAIM FOR RELIEF // 11 U.S.C. § 523(a)(6)

71.     Except to the extent inconsistent with the relief in this count, Plaintiff incorporates by reference the allegations set forth in paragraphs 1 – 43 as if set forth at length herein.

72.     Defendant was possessed of certain property of the Plaintiff, to which Plaintiff is entitled to possession of.

73.     Despite demand therefor, the Defendant has refused to deliver the property to Plaintiff.

74.     To date, the Defendant continues to be in wrongful possession of the property and keeps such property shrouded and out of reach from the Plaintiff.

75.     As a direct and proximate result of the Defendant's conduct, Plaintiff has sustained damages as alleged herein or in such other amount as may be shown at trial.

76.     The acts of the Defendant in converting the Plaintiff's property are intentional and designed to harm the Plaintiff while obtaining benefits to which the Defendant is not entitled, as

a result of which, Plaintiff is entitled to recover exemplary or punitive damages from the Defendant in addition to all other amounts recovered herein.

77.     The debt alleged herein constitutes a willful and malicious injury by the Defendant to Plaintiff or the property of the Plaintiff, within the meaning of 11 U.S.C. § 523(a)(6) and is thus nondischargable.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief against the Defendant:

a.     Enter an Order denying dischargeability of the Defendant's debts to Plaintiff based on Defendant's actions as related herein pursuant to 11 U.S.C. §523(a)(2), (4), and (6);

b.     Enter a judgment against Defendant and in favor of Plaintiff for damages incurred as a result of the fraud and misrepresentations perpetrated by the Defendant, and award Plaintiff actual, compensatory, and punitive/exemplary damages;

c.     Enter a judgment against Defendant and in favor of Plaintiff for damages incurred as a result of the Defendant's fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny, and award Plaintiff actual, compensatory, and punitive/exemplary damages;

d.     Enter a judgment against Defendant and in favor of Plaintiff for damages incurred as a result of the Defendant's interference with the property of Plaintiff, and award Plaintiff actual, compensatory, and punitive/exemplary damages; and

e.     Any and all further relief this Court finds reasonable, just, or equitable.

Respectfully submitted this the 25th day of September, 2020.

MARTINEAU KING PLLC
*Attorneys for PW Funding, LLC*

/s/ Joseph W. Fulton
Joseph W. Fulton (NC Bar No. 44388)
JFulton@MartineauKing.com
PO Box 241268
Charlotte, NC 28224
Telephone:     (704) 247-8520
Facsimile:     (704) 247-8582

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this day served a copy of the foregoing Complaint

electronically using the CM/ECF system that will send a notice of electronic filing to all parties

who have consented to receiving electronic notices in this case.  The complaint has also been

mailed to Defendant-Debtor Jane Quintana at 8705 Kimalden Court, Wake Forest, NC 27587.

This the 25th day of September, 2020.

/s/ Joseph W. Fulton
Joseph W. Fulton

# PLAINTIFF'S EXHIBIT A

DocuSign Envelope ID: CA95B0D7-6E56-4676-A6C0-431558635727

 

## Praxis™

### RECEIVABLES PURCHASE AND SALE AGREEMENT

This Receivables Purchase and Sale Agreement ("Agreement") dated **04/25/2019** between buyer, PW Funding, LLC ("Buyer") and the seller, **Jane Quintana, D.M.D., P.A.** ("Seller").  Buyer appoints **Provider Web Capital Funding, LLC dba Aquina Health** as its processor ("Processor").

### SELLER'S INFORMATION

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Business Legal Name: | **Jane Quintana, D.M.D., P.A.** | State of Incorporation / Organization: | | | | **NC** | | |
| Type of Entity: | **Corporation** | | | | | | | |
| Physical Address: | **1936 Heritage Branch Rd** | City: | **Wake Forest** | State: | **NC** | Zip: | **27587** | |
| Mailing Address: | **1936 Heritage Branch Rd** | City: | **Wake Forest** | State: | **NC** | Zip: | **27587** | |
| Date Business Started: | **12/11/2006** | Federal ID or EIN#: | █████ | | | | | |
| Contact Name: | **Jane Quintana** | Position: | | **CEO** | | | | |
| Phone: | **(919) 671-1924** | E-mail: | **N/A** | | Website: | **http://www.smilesofwakeforest.com/** | | |
| Bank Name: | **Wells Fargo** | City: | **Portland** | State: | **OR** | | | |

### PURCHASE AND SALE OF CURRENT AND FUTURE RECEIVABLES

Buyer hereby pays Seller **$300,000.00** ("Purchase Price") in exchange for Seller's right, title, and interest in and to Seller's current and future receivables, and all proceeds thereof arising, including but not limited to medical claims payments by Seller's obligors such as patients, insurers, government entitlement programs, third party administrators and employers (each, an "Obligor"), as well as payments made in connection any product sold and any service performed (collectively referred to as "Purchased Receivables") in the amount of **$402,000.00** ("Specified Amount").  Seller will remit the Specified Amount of Purchased Receivables to Buyer by allowing Processor to debit or otherwise withdraw (via the Automated Clearing House ("ACH") system, electronic checks, wires, or otherwise) from an account Seller established with **Wells Fargo** with the account number █████ the "Account").  Processor may periodically debit or otherwise withdraw in an amount of cash equal to **$4,020.00** ("Weekly Payment") each **Monday**, or the next good business day.  It is anticipated that the Weekly Payments will be a portion of all payments made by electronic funds transfer, debit cards, credit cards, charge cards, bank cards, virtual card payments and other payment cards as well as payments received via cash or check of the types settled, directly or indirectly, otherwise due to Seller in respect of the Purchased Receivables (collectively referred to as "Payments").  Processor may debit or otherwise withdraw from the Account as Payments are received or at any other time in the sound discretion of the Processor.  No delay by Processor forfeits, waives, or otherwise relinquishes Seller's promises to remit as mentioned above.  Seller shall use its best efforts to originate a sufficient number of receivables to ensure that Buyer receives the Specified Amount in full by no later than **03/25/2021**.

### ACCOUNT INSTRUCTIONS AND ACCESS

As of the date of this Agreement, Seller acknowledges and confirms that Seller has established the Account.  Seller shall cause all of the Seller's receivables to be deposited into the Account.  Seller shall grant Processor the ability to view the Account and download Account information, and other activity reports as necessary to determine ACH collection amounts.  Seller further agrees that any modified instructions with respect to the disposition and collection of the Account may be executed as an addendum to this Agreement and must be jointly agreed to and duly executed by the Seller and Buyer and must include any modified account information and must be received by Processor or Buyer at least thirty (30) days in advance of desired modification date.  To the extent that Processor's ability to access the Account pursuant to this Agreement is limited or subsequently restricted, subject to the default provision below, Seller agrees to immediately work with Processor to restore such full access.

### FEES

Seller shall pay Processor a one-time $0.00 Due Diligence fee upon signing of the term sheet for administrative services. Seller shall pay Processor a one-time $7,500 Commitment Fee upon payment of the Purchase Price.  Seller shall also pay a Monthly Processing

1 *** RECEIVABLES PURCHASE AND SALE AGREEMENT

DocuSign Envelope ID: CA95B0D7-6E56-4676-A6C0-431558635727

Fee of $0.00 on the first business day of each calendar month. This Monthly Processing Fee will cover the cost of statement production and ACH transactions by the Processor and will not apply to the Specified Amount to be paid by the Seller. Buyer and Processor may charge additional amounts for providing copies and other documentation Seller may request from time to time (a list of such charges will be made available upon request or online, within a reasonable time). Seller agrees that Buyer, its designees, and Processor may debit or otherwise withdraw such fees and charges from Seller's accounts, including the Account. Buyer and Processor are not responsible for any fees charged by Seller's bank as a result of credits or debits initiated under this Agreement. The origination of ACH transactions to and from the Account must comply with provisions of U.S. law. Seller agrees that a processing fee or commission will be charged for processing receipts of Payments ("Processor's Fee") that will not offset the Specified Amount of Purchased Receivables. The Processor's Fee may be taken at the time of Processor debits or otherwise withdrawals of the Weekly Payment.

## PERSONAL GUARANTY

In consideration of Buyer's agreement to purchase the Specified Amount of Purchased Receivables from Seller and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, all persons signing below as guarantor, whether one or more guarantors, ("Guarantor") jointly, severally and unconditionally guarantee ("Personal Guaranty") to Buyer and its successors and assigns, the prompt payment and performance of all debts, obligations, liabilities and undertakings now or hereafter existing, absolute or contingent, of Seller to Buyer and to its subsidiaries and affiliates, including, but not limited to, obligations arising under this Agreement, including any modifications, addendums, or replacements to such agreement and including any changes to terms, premiums, Purchase Price, Specified Amount, Weekly Payment or fees. All amounts owed under this Personal Guaranty and under this Agreement may be collectively referred to as "Obligations". Guarantor waives all requirements of notice, demand, presentment or protest, all other defenses that may be available to a surety and any right Guarantor may have to require Buyer first to proceed against Seller or any other Obligor, or first to realize on any security held by Buyer before proceeding against Guarantor hereunder. Guarantor waives all rights of setoff and exoneration, or subrogation until the Obligations shall have been paid and/or performed in full. Guarantor agrees that Buyer may modify or extend the terms of the Agreement or of any other Obligations, or compromise, settle, or release Seller or any other Obligor under the Agreement or the Obligations, all without notice to or consent by Guarantor and without affecting Guarantor's liability hereunder. Guarantor agrees to pay the costs and expenses (including attorneys' fees) of Buyer in enforcing this Personal Guaranty. Guarantor grants Buyer the right of setoff for all matured and un-matured Obligations against all deposits and property of Guarantor now or hereafter in the possession or control of Buyer or its affiliates without regard to the adequacy of collateral. Guarantor grants Buyer all of his interest in the Collateral securing this Agreement that he may have in such property to secure Guarantor's Obligations. This Personal Guaranty shall be binding upon Guarantor's successors and assigns. Guarantor hereby acknowledges that Buyer has relied upon this Personal Guaranty as a material inducement for Buyer's execution of the Agreement. Guarantor hereby further acknowledges that he or she will benefit, directly or indirectly, from Buyer's purchase of the Specified Amount of Purchased Receivables from Seller. This Personal Guaranty may be modified only by a written agreement signed by Buyer. Guarantor hereby absolutely, knowingly, unconditionally and expressly waives and agrees not to assert any and all benefits or defenses arising directly or indirectly under any one or more of California Civil Code Sections 2799, 2808, 2809, 2810, 2815, 2819, 2820, 2821, 2822, 2825, 2839, 2845, 2848, 2849, and 2850. THIS PERSONAL GUARANTY IS GOVERNED BY FEDERAL LAW AND THE LAWS OF THE STATE OF GEORGIA. GUARANTOR ACKNOWLEDGES THIS IS A COMMERCIAL TRANSACTION AND NOT A CONSUMER TRANSACTION. Guarantor agrees that Buyer may rely on a facsimile of this Personal Guaranty. Guarantor acknowledges that it has had the opportunity to consult with counsel of its own choosing with respect to this Personal Guaranty. This Personal Guaranty is intended to take effect as an instrument under seal.

[Signatures follow on the next page]

[Additional Terms follow on the pages after Signatures]

DocuSign Envelope ID: CA95B0D7-6E56-4676-A6C0-431558635727

## AUTHORIZATION AND ACCEPTANCE

To the extent set forth herein, each of the undersigned shall be obligated upon execution of the Agreement to all terms of the Agreement, including Additional Terms of Agreement set forth on the pages that follow. This Agreement is intended to take effect as an instrument under seal. The person executing this Agreement on behalf of Seller represents and warrants that he is authorized to do so and to bind Seller to all of the terms and conditions set forth herein. Each of the undersigned represents and warrants that the information provided herein and in each of Buyer's forms is true, accurate and complete in all respects. If any such information is false or misleading, Seller shall be deemed in material breach of all agreements between Seller and Buyer and Buyer shall be entitled to all remedies available under law. An investigative or consumer report may be made or pulled in connection with the Agreement. Seller and each of the Guarantor(s) authorizes Buyer and each of Buyer's affiliates (each, a "Company"), their agents and representatives and any credit reporting agency engaged by any Company, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Guarantor(s) for the purpose of this Agreement and (ii) pull credit reports, and share such credit reports with any other Company, (A) at any time now or for so long as Seller or Guarantor(s) continue to have any obligation to Buyer as a consequence of this Agreement or (B) at any time in order for a Company to determine Seller's eligibility for a financial product offered by any Company. Buyer's payment of the Purchase Price shall be deemed Buyer's acceptance and performance of this Agreement not withstanding Buyer not executing this Agreement. Buyer may sell, assign, transfer or convey some or all of its rights, title and interest in and to the Obligations of the Seller and this Agreement in its sole discretion.

**SELLER:**

*Jane Quintana*
BA47A2CF4ABB438...
(under seal)
Jane Quintana, D.M.D., P.A.
By: Jane Quintana

**GUARANTOR(S):**

*Jane Quintana*
BA47A2CF4ABB438...
(under seal)
Jane Quintana
1096 Silver Leaf Dr
Youngsville, NC 27596
(919) 671-1924

**SO AGREED:**

**BUYER:**

PW Funding, LLC
By: _____

3 *** RECEIVABLES PURCHASE AND SALE AGREEMENT

DocuSign Envelope ID: CA95B0D7-6E56-4676-A6C0-431558635727

## ADDITIONAL TERMS OF THE AGREEMENT

Capitalized terms used but not defined in these Additional Terms of the Agreement shall have the meanings assigned to such terms defined in the Receivables Purchase and Sale Agreement.

### 1.  PROCESSING TERMS AND ARRANGEMENTS.

**Section 1.1.** *Processing Agreement.*
Seller understands and agrees that this Agreement irrevocably authorizes Processor to pay all cash collections in respect of the Purchased Receivables to Buyer rather than to Seller until Buyer receives payment in full of the Specified Amount of Purchased Receivables, plus any other amounts due and owing to Buyer hereunder, from Processor. These authorizations and instructions may be revoked only with the prior written consent of Buyer as described in this Agreement. Seller agrees that Processor may rely upon the instructions of Buyer, without any independent verification, in making the cash payments described above. Seller waives any claim for damages it may have against Processor in connection with actions taken based on instructions from Buyer, unless such damages were due to such a Processor failure to follow Buyer's instructions. Seller acknowledges and agrees that: (a) Processor will be acting on behalf of Buyer with respect to the Purchased Receivables until Buyer has received payment in full of the Specified Amount of Purchased Receivables, plus any other amounts due and owing to Buyer hereunder; (b) Processor may or may not be an affiliate of Buyer; (c) Buyer does not have any power or authority to control Processor's actions with respect to the processing of Payments or remittance of cash to Buyer; (d) Buyer is not responsible and shall not be liable for, and Seller agrees to hold Buyer harmless for, the actions of Processor; and (e) funds representing the Specified Amount in the possession of Processor constitute the property owned solely by Buyer, and Seller disclaims any and all interest therein.

**Section 1.2.** *Instructions to Processor.*
Seller hereby irrevocably instructs Processor to hold the Purchased Receivables on behalf of Buyer and to remit directly to Buyer the cash attributable thereto. Seller acknowledges and agrees that Processor shall provide Buyer with the transaction history of Payments. Seller hereby (i) authorizes Buyer to contact any past, present or future processor of Seller, its predecessors or affiliates, to obtain any information that Buyer deems necessary or appropriate regarding any of their transactions with such processors, and (ii) authorizes and directs such processors to provide Buyer with all such information in compliance with this Section 1.2. Such information may include information to verify the amount of receivables previously processed on behalf of Seller, its predecessors or affiliates, and any amounts that may have been paid to, offset, held or reserved by, such processors. Without limiting the generality of the foregoing, Seller authorizes Buyer to contact any past, present or future processor of Seller, its predecessors or affiliates, to confirm that Seller is exclusively using the Processor accepted by Buyer in accordance with this Agreement.

**Section 1.3.** *Indemnification and Duty to Defend.*
Seller shall at all times during and after this Agreement be responsible for, and shall defend, indemnify, and hold Buyer, Processor, and their respective officers, directors, affiliates, employees, agents and representatives harmless from and against any and all losses, claims, suits, proceedings, expenses, recoveries, and damages, including reasonable legal expenses and costs including attorneys' fees, arising out of any claim by a third party related to this Agreement.

**Section 1.4.** *Limitation of Liability.*
In no event will Processor or Buyer be liable for any claims asserted by Seller under any theory of law, including any tort or contract theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby expressly waived by Seller.

**Section 1.5.** *Account; Authorization to Withdraw from Accounts.*
Seller represents and warrants that the Account is the Seller's sole bank account into which all Payments will be deposited and is that Account identified by account name, account number, and bank name and address that is shown on the face of the voided check that seller shall provide to Buyer along with this Agreement, the delivery of which voided check is a condition precedent to Buyer's obligations under this agreement. If Processor transfers to the Account or any other account of Seller or Guarantor(s) any funds that should have been transferred to Buyer pursuant to Sections 1.1 and 1.2 hereof, Seller shall, and shall cause Guarantor(s) to, immediately segregate and hold all such funds in express trust for Buyer's sole and exclusive benefit. In any such circumstance, Seller shall maintain in the Account a minimum balance equal to Buyer's undivided interest in such funds or the Weekly Payment multiplied by Seller's average daily Payments volume based on the processing records provided to Buyer prior to the date of this Agreement (assuming twenty-one days of processing per month) multiplied by three (3), whichever is greater ("Minimum Balance"), until such funds are paid to Buyer. Seller and each Guarantor hereby irrevocably authorize Buyer and Processor to debit or otherwise withdraw (via the ACH system, electronic checks, wires or otherwise) such funds and any fees, costs, charges or other amounts Buyer is entitled to receive hereunder, directly from all such accounts, including the Account, to the extent such authorizing Party (as defined in Section 4.6 hereof) is liable therefor hereunder, and shall not revoke or cancel such authorizations until such time as Buyer has received payment in full of the Specified Amount of Purchased Receivables and any other amounts due and owing to Buyer hereunder. Seller and Guarantor(s) acknowledge and agree that Buyer and Processor may issue pre-notifications to Seller's and Guarantor(s)'s bank(s) with respect to such debit withdrawal and other transactions. Within two business days of any request by Buyer, Seller shall provide, or cause Processor, the applicable bank(s) or Guarantor(s) to provide, Buyer with records and other information regarding Payments, the Account and any other accounts of Seller or Guarantor(s). Seller and Guarantor(s) hereby authorize and direct the applicable bank(s) to provide Buyer with all such information in compliance with this Section 1.5.

**Section 1.6.** *Excess Cash.*
In the event that the amount of cash remitted to Buyer pursuant to this Agreement exceeds the sum of the Specified Amount and any other amounts Buyer is entitled to receive hereunder ("Excess Cash") by at least $100.00, Buyer agrees to pay such Excess Cash to Seller within thirty (30) days after receipt thereof by Buyer. In the event the Excess Cash is less than $100.00, Buyer agrees to pay such Excess Cash to Seller within thirty (30) days after its receipt of a written request from Seller, provided such request is made within six months of Buyer's receipt of such Excess Cash. Seller acknowledges and agrees that Buyer has no obligation to take any action (including against Processor) with respect to any cash being held by Processor, which will become Excess Cash once it is paid by Processor to Buyer, prior to the receipt of such Excess Cash by Buyer.

**Section 1.7.** *Reliance on Terms.*
The provisions of this Agreement are agreed to for the benefit of Seller, Guarantor(s), Buyer, and Processor, notwithstanding the fact that Processor is

DocuSign Envelope ID: CA95B0D7-6E56-4676-A6C0-431558635727

not a party to this Agreement. Processor may rely upon the terms of this Agreement and raise them as defenses in any action.

**Section 1.8.** *Intent of Parties.*
It is the express intent of the Seller and the Buyer that the conveyance of the Specified Amount of the Purchased Receivables by the Seller to the Buyer as contemplated by this Agreement shall be, and be treated for all purposes as, a true sale and absolute conveyance by the Seller of the Specified Amount of the Purchased Receivables, conveying good title thereto free and clear of any Liens, and the beneficial interest in and title to the Specified Amount of the Purchased Receivables shall not be part of the Seller's estate in the event of the filing of a bankruptcy petition by or against the Seller under any bankruptcy or similar law.

**2.      REPRESENTATIONS, WARRANTIES AND COVENANTS.**
Seller and Guarantor(s) represent, warrant and covenant the following as of the date hereof and during the term of this Agreement:

**Section 2.1.** *Seller Contractual Covenants.*
Seller agrees as follows (collectively the following referred to as "Seller Contractual Covenants"): (i) to not materially change the nature of the business it conducts from the type of business originally disclosed to Buyer in connection with this Agreement or to Processor as of the date of this Agreement; (ii) to exclusively use Processor for the processing of Payments, to not change its arrangements with Processor in any way that is adverse to Buyer, and to not take any action that has the effect of causing the processor through which any Payments are settled to be changed from the Processor initially approved by Buyer to another, or additional, processor; (iii) to not take any action to discourage the use of Payments and to not permit any event to occur that could have an adverse effect on the use, acceptance or authorization of Payments for the purchase of Seller's services and products; (iv) to not open a new account other than the Account into which all Payments will be deposited, to not take any action to cause Purchased Receivables to be settled or delivered to any account other than the Account, and to not revoke or cancel any of the authorizations to debit or otherwise withdraw from, or access the Account or any other account of Seller described in this Agreement; (v) to not sell, dispose, convey or otherwise transfer its business without the express prior written consent of Buyer and the assumption of all of Seller's obligations under this Agreement pursuant to documentation reasonably satisfactory to Buyer; (vi) to not sell, assign, convey, dispose of, or otherwise transfer any portion of the Purchased Receivables to any person or entity other than Buyer; (vii)

to not grant or permit any Lien (as defined in Section 2.11 hereof) upon any of its accounts receivable, including Purchased Receivables, for the benefit of any person or entity other than Buyer; (viii) to maintain a Minimum Balance (as defined in Section 1.5) in the Account to the extent required as provided in Section 1.5 hereof, and (ix) to use commercially reasonable efforts to collect or cause to be collected the Purchased Receivables for the benefit of Processor and Buyer in accordance with prudent and customary industry standards. Buyer, Seller and Guarantors acknowledge and agree that Seller going bankrupt or out of business, in and of itself, does not constitute a breach of the Seller Contractual Covenants.

**Section 2.2.** *Business Information.*
All information (financial and other) provided by or on behalf of Seller to Buyer in connection with the transactions contemplated by this Agreement is true, accurate and complete in all respects. Seller shall furnish Buyer and Processor such information as Buyer may request from time to time.

**Section 2.3.** *Reliance on Information.*
Seller acknowledges and agrees that all information (financial and other) provided by or on behalf of Seller and Guarantor(s) to Buyer has been relied upon by Buyer in connection with its decision to purchase the Specified Amount of Purchased Receivables from Seller.

**Section 2.4.** *Compliance.*
Seller is in compliance with any and all applicable federal, state and local laws and regulations and rules and regulations of card associations and payment networks. Seller possesses and is in compliance with all permits, licenses, approvals, consents, registrations and other authorizations necessary to own, operate and lease its properties and to conduct the business in which it is presently engaged.

**Section 2.5.** *Authorization.*
Seller and the person(s) signing this Agreement on behalf of Seller have full power and authority to enter into and perform the obligations under this Agreement, all of which have been duly authorized by all necessary and proper actions.

**Section 2.6.** *Insurance.*
Seller shall maintain insurance in such amounts and against such risks as are consistent with past practice and shall show proof of such insurance upon the request of Buyer.

**Section 2.7.** *Change of Name, Location, Etc.*
Seller does not and shall not conduct Seller's business under any name other than as set forth on page one of this Agreement and shall not change its place of business. Seller shall not change its legal name, entity

type or state of formation, unless it has provided Buyer with at least thirty (30) days prior written notice thereof and any documents, agreements and information requested by Buyer with respect thereto.

**Section 2.8.** *Seller Not Indebted to Buyer.*
Seller is not a debtor of Buyer as of the date of this Agreement.

**Section 2.9.** *Exclusive Use of Processor.*
Seller understands and agrees that the services of Processor are the exclusive means by which Seller can and shall process any and all Payments.

**Section 2.10.** *Working Capital Funding.*
Seller shall not enter into any arrangement, agreement or commitment that relates to or involves Purchased Receivables, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Purchased Receivables or current or future Payments with any person or entity other than Buyer.

**Section 2.11.** *Unencumbered Purchased Receivables.*
Seller has, and at all times will have, good, complete and marketable title to all Purchased Receivables, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever, other than those created by this Agreement (collectively, "Liens") or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of, Buyer. Without limiting the generality of the foregoing, all Purchased Receivables purchased by Buyer hereunder shall be free and clear of any and all Liens (other than Buyer's ownership rights therein) at the time they become receivables. All amounts received by Buyer attributable to the Specified Amount of Purchased Receivables purchased by Buyer hereunder shall arise from either bona fide sales by Seller of its goods and services to actual patients or the performance by Seller of other services on behalf of Obligors.

**Section 2.12.** *Business Purpose.*
Seller is a valid business in good standing under the laws of each jurisdiction in which it is organized or operates, and Seller is entering into this Agreement solely for business purposes and not as a consumer for personal, family or household purposes.

**Section 2.13.** *Conduct of Business.*
Seller shall conduct its business consistent with past practice. Seller has no present intention to close or cease operating its business, in whole or in part, temporarily or permanently. As of the date hereof, Seller is solvent and is not contemplating any insolvency    or bankruptcy proceeding. During the four (4) months preceding the date hereof, neither Seller nor any

DocuSign Envelope ID: CA95B0D7-6E56-4676-A6C0-431558635727

Guarantor has discussed with or among Seller's management, with counsel, or with any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of creditors with respect to Seller and no such action or proceeding has been filed or is pending. Other than as disclosed to Buyer in a writing attached to this Agreement, no eviction or foreclosure is pending or threatened against Seller or any Guarantor.

**Section 2.14.** *Validity of Purchased Receivables.*
Each Purchased Receivable is a valid and binding obligation of the related Obligor, enforceable against such obligor in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting the enforcement of creditors' rights and general equitable principles which may limit the availability of equitable remedies.

**Section 2.15.** *No Defenses to Payment.*
No Purchased Receivable is subject to any dispute, offset, counterclaim or defense whatsoever, including, without limitation, the defenses of fraud or usury.

**Section 2.16.** *No Consent Required.*
Each Purchased Receivable is assignable without notice to or the consent of the related Obligor.

**3.      ADDITIONAL PROVISIONS.**
**Section 3.1.** *Sale of Purchased Receivables.*
Seller and Buyer agree that the Purchase Price paid by Buyer in exchange for the Specified Amount of Purchased Receivables is a purchase of the Specified Amount of Purchased Receivables and is not intended to be, nor shall it be construed as, a loan or financial accommodation from Buyer to Seller. By such purchase and sale, Seller transfers to Buyer full and complete ownership of the Specified Amount of Purchased Receivables and Seller retains no legal or equitable interest therein. Seller is selling the Specified Amount of Purchased Receivables to Buyer in Seller's normal course of business and the Purchase Price paid by Buyer therefor is good and valuable consideration for such sale. Seller will use the proceeds of such sale solely for business purposes. Buyer shall have the unencumbered right to sell, assign, transfer and pledge all or any portion of the Specified Amount of Purchased Receivables to one or more third parties at any time without the consent of the Seller.

**Section 3.2.** *No Right to Repurchase.*
Seller acknowledges and agrees that it has no right to repurchase the Specified Amount of Purchased Receivables, or any portion thereof, from Buyer.

**Section 3.3.** *Default, and Remedies*

Each of the following events is a Default under this Agreement: (a) any representation or warranty made by Seller in this Agreement is determined by Buyer to be materially false or incorrect; (b) a petition is filed by or against Seller or Guarantor under any bankruptcy or insolvency law or a trustee, receiver, or liquidator is appointed for Seller or Guarantor or any substantial part of their assets; (c) Seller or any Guarantor makes an assignment for the benefit of creditors; (d) any Guarantor dies, stops doing business as a concern or transfers all or substantially all of such Guarantor's assets; (e) Seller stops doing business as a going concern or transfers all or substantially all of its assets; (f) any interruption in Processor and / or Buyer's access to the Account; (g) Buyer, through Processor, is inhibited from taking the Weekly Payment when Processor initiates or attempts to debit or otherwise withdraw such Weekly Payment; (h) Seller breaches any of the Seller Contractual Covenants listed in Section 2.1; or (i) the occurrence of any significant and material adverse change in the business, operations, properties or condition (financial or otherwise) of Seller or any Guarantor, which, in the reasonable opinion of the Buyer acting in good faith, impairs its security or increases its risk. When a Default occurs, Buyer shall have the right to exercise any and all legal remedies available to it by applicable laws, including, without limitation, the right to require Seller to repurchase the Specified Amount of the Purchased Receivables from Buyer at a price equal to the Specified Amount, less all amounts received by Buyer in respect of thereof pursuant to this Agreement. Additionally, Buyer is entitled to all amounts due under this Agreement, including but not limited to the Specified Amount, less all amounts received by Buyer in respect thereof pursuant to this Agreement. Furthermore, Buyer shall have the right to directly undertake collection of the Purchased Receivables until Buyer has received the Specified Amount and all other amounts due to it under this Agreement. Buyer may charge Seller interest on all amounts due it from the date of default until paid at the rate of eighteen percent (18%) per annum, but in no event more than the maximum rate permitted by applicable law. Further, upon default, Buyer may seek possession of any and all property that it has a security interest in pursuant to this Agreement, including without limitation the Purchased Receivables Collateral and the Other Collateral (collectively, the "Collateral") or require Seller to surrender any and all Collateral. This may be accomplished by the Buyer demanding the Seller to enter into a redirection agreement whereby the Seller will irrevocably instruct

all payers of Payments to make future Payments into an account of the Seller under a control agreement with the Buyer or Processor. If Buyer takes possession of any Collateral, Buyer agrees to sell or otherwise dispose it under such terms as may be acceptable to it in its sole discretion with or without notice, at a public or private disposition, and will apply the net proceeds (after it deducts all costs, including reasonable attorneys' fees) to the amounts Seller owes to Buyer. Seller will be responsible for any deficiency balance after disposing of Collateral, all to the extent permitted by law. Seller waives the rights it may have to notice before Buyer seizes any of the Collateral. Seller agrees that all rights and remedies are cumulative and not exclusive. Seller promises to pay reasonable attorneys' fees and any cost / fee associated with any action, including collection, to enforce this Agreement. Seller hereby agrees that Buyer, itself or through the Processor, may automatically debit or otherwise withdraw such damages from Seller's accounts (including the Account) via the ACH system, electronic checks, wire transfers or otherwise.

**Section 3.4.** *Right to Cure.*
There shall be no right to cure any default event identified in Section 3.3 or elsewhere in this agreement, except to the extent the following permits. When an event of default mentioned in Section 3.3(f) or (g) occurs, the Seller shall have five (5) business days from Buyer and / or Processor's sending of notice to cure any issue regarding accessing the Account. Either the Buyer or the Processor may send such Notice by electronic mail to the Seller in addition to other methods of Notice allowed pursuant to Section 4.2.

**Section 3.5.** *Power of Attorney.*
In addition to any other remedies available for violation of the Seller Contractual Covenants, in the event that Seller redirects the payment of Purchased Receivables, changes or permits the change of the Processor accepted by Buyer or utilizes the services of an additional processor, Buyer shall have the right, without waiving any of its rights or remedies and without notice to Seller or Guarantor(s), to notify the new bank or additional processor and any Obligor of the sale of the Specified Amount of Purchased Receivables hereunder and to direct any such entity to make payment to Buyer of all or any portion of the amounts received or held by any such entity for or on behalf of Seller to pay any amounts Buyer is entitled to receive hereunder. Seller hereby grants to Buyer an irrevocable power of attorney, which power of attorney shall be coupled with an interest, and hereby appoints Buyer and its designees as Seller's attorney-in-fact, to take any and all actions necessary or appropriate to direct

**6 *** RECEIVABLES PURCHASE AND SALE AGREEMENT**

DocuSign Envelope ID: CA95B0D7-6E56-4676-A6C0-431558635727

any such entity to make payment to Buyer as contemplated by this Section 3.5.

**Section 3.6.** *Security Agreement; Financing Statements.*

In the event that, notwithstanding the intent of the parties expressed in Sections 1.8 and 3.1 above, any or all of the Purchased Receivables are held to continue to be deemed property of the Seller after the sale of the Specified Amount thereof to the Buyer, then (i) this Agreement shall also be deemed to be a security agreement within the meaning of Articles 8 and 9 of the Uniform Commercial Code in effect from time to time in the State of Georgia (the "UCC"), and (ii) the conveyance of the Specified Amount of the Purchased Receivables provided for herein shall be deemed to be a grant by the Seller to the Buyer of a lien upon and security interest in all of the Seller's right, title and interest in and to the following property of Seller wherever found (collectively, the "Purchased Receivables Collateral"): (a) the Specified Amount of the Purchased Receivables, wherever located, now or hereafter owned or acquired by Seller, (b) all accounts related to the Purchased Receivables, (c) all deposit accounts and deposits therein related to the Purchased Receivables, and (d) all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, in each case as such terms are defined in Article 9 of the UCC (to the extent not otherwise defined herein).

In addition, in order to secure performance of the Seller Contractual Covenants and all of the other obligations of Seller to Buyer under this Agreement or any other agreement between Seller and Buyer, Seller grants to Buyer a continuing priority security interest in the following property of Seller wherever found (collectively, the "Other Collateral"): (a) all personal property of Seller other than the Purchased Receivables Collateral, including, without limitation, accounts, instruments, contracts, contract rights, chattel paper, letters of credit, rents, monies, profits and products, Payments, documents, deposit accounts and deposits therein, receivables, including but not limited to health-care-insurance receivables, government program receivables and receipts, insurance refunds and proceeds for any of the property named herein, payment intangibles, supporting obligations, equipment (including but not limited to tools, parts, supplies, computers, televisions, and other electronic devises), books, records, computer software, manuals, computer data, customer and patient payment records, any reserve amounts or accounts of Seller that are maintained on the books and records of the Buyer, general intangibles, instruments, inventory (as those terms are defined in Article 9 of the UCC), wherever located, now or hereafter owned or acquired by Seller; (b) all trademarks, trade names, service marks, logos and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office ("USPTO") or equivalent state department and all renewals, reissues and extensions thereof (collectively "IP") whether now owned or hereafter acquired, together with any written agreement granting any right to use any IP; and (c) all proceeds with respect to the items described in (a) and (b) above, as the term 'proceeds' is defined in Article 9 of the UCC, including all accessions to, substitutions and replacements for, and rents, profits and products, proceeds of any insurance, indemnity, warranty or guaranty, all returned, repossessed, and reclaimed goods, and all books and records related to the foregoing. Seller understands and agrees that Buyer may file one or more (i) UCC-1 financing statements at any time to perfect Buyer's interests in the Purchased Receivables Collateral and the Other Collateral created under the UCC by this Agreement, and (ii) assignments with USPTO to perfect the security interest in IP described above. The UCC-1 financing statements for the Purchased Receivables Collateral shall state that the sale of the Specified Amount of Purchased Receivables is intended to be a sale and not an assignment for security. Such financing statements also may state that Seller is prohibited from transferring Purchased Receivables to any person or entity other than Buyer, or granting any security interest in its accounts receivable to any person or entity other than Buyer until Buyer has received the Specified Amount of Purchased Receivables and any other amounts Buyer is entitled to receive hereunder. Seller hereby authorizes Buyer, or any person or entity instructed to do so on behalf of the buyer, to file such financing statements and any continuation statements or amendments thereto, and ratifies the filing of any financing statement filed by or on behalf of Buyer prior to the effectiveness of this Agreement. Buyer's rights under this Section 3.6 shall apply equally to any subsequent or other agreement between Seller and Buyer. Seller agrees that it shall, from time to time, promptly execute and deliver all instruments and documents, and take all further action, that may be necessary or appropriate, or that Buyer may request, to perfect against Seller and all third parties the sale of the Specified Amount of Purchased Receivables hereunder or to enable Buyer to exercise and enforce its rights and remedies hereunder.

**Section 3.7.** *Protection of Information.*

Seller and each person signing this Agreement on behalf of Seller or as a Guarantor, in respect of himself or herself personally, authorizes Buyer and Processor to disclose to any third party information concerning Seller's and each Guarantor's credit standing (including credit bureau reports that Buyer obtains) and business conduct. Seller and each Guarantor hereby waives to the maximum extent permitted by law any claim for damages against Buyer or any of its affiliates relating to any (i) investigation undertaken by or on behalf of Buyer as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**Section 3.8.** *Solicitations.*

Seller and each Guarantor authorizes Buyer, its affiliates, and Processor to communicate with, solicit and market to Seller and each Guarantor via regular mail, telephone, email and facsimile in connection with the provision of financial products, goods or services by Buyer, its affiliates, Processor or any third party, including those that Buyer and / or Processor shares, transfers, exchanges, discloses or provides information with or to pursuant to Section 3.7, and will hold Buyer, its affiliates, Processor and such third parties harmless against any and all claims pursuant to the federal CAN-SPAM ACT of 2003 (Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003), the Telephone Consumer Protection Act (TCPA), and any and all other state or federal laws relating to transmissions or solicitations by any of the methods described above.

**Section 3.9.** *Confidentiality.*

Seller understands and agrees that the terms and conditions of the products and services offered by Buyer and / or Processor, including this Agreement and any other Buyer and / or Processor documentation (collectively referred to as "Confidential Information") are proprietary and confidential information of Buyer and / or Processor. Accordingly, unless disclosure is required by applicable law or court order, Seller shall not disclose Confidential Information to any person other than an attorney, accountant, financial advisor or employee of Seller who needs to know such information for the purpose of advising Seller (collectively referred to as "Advisor"), provided such Advisor uses such information solely for the purpose of advising Seller and first agrees in writing to be bound by the terms of this Section 3.9.

**Section 3.10.** *Publicity.*

Seller and each Guarantor authorize Buyer and Processor to use its, his, or her name in a listing of clients and in advertising and marketing materials.

**Section 3.11.** *Inspection of Collateral and Place of Business.*

**7 \*\*\* RECEIVABLES PURCHASE AND SALE AGREEMENT**

DocuSign Envelope ID: CA95B0D7-6E56-4676-A6C0-431558635727

Buyer or its designated representatives and agents, including Processor, shall have the right, during Seller's normal business hours and at any other reasonable times, to examine the Collateral where located and the interior and exterior of any of Seller's places of business. Any such examination of any of Seller's places of business may include, among other things, whether Seller (a) has a place of business that is separate from any personal residence, (b) is open for business, (c) has sufficient inventory to conduct its business and (d) has one or more point-of-sale terminals or other systems of record used to process Payments.

## 4.   MISCELLANEOUS.

**Section 4.1.**  *Modifications; Amendments; Construction.*

No modification, amendment or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the parties affected. The headings of the sections and subsections herein are inserted for convenience only and under no circumstances shall they affect in any way the meaning or interpretation of this Agreement. For purposes of this Agreement, 'including' shall mean 'including, without limitation' and 'and' shall mean 'and/or.' Any reference in this Agreement (a) to the singular includes the plural where appropriate, and (b) to the masculine gender includes the feminine and neuter genders where appropriate.

**Section 4.2.**  *Notices.*

All notices, requests, demands and other communications hereunder shall be in writing and shall be delivered by mail, overnight delivery or hand delivery to the respective Parties, unless otherwise permitted under this Agreement. Notices to Buyer shall be sent to the Processor, as agent for the Buyer, at Provider Web Capital Funding, LLC, dba Aquina Health 3300 Highlands Parkways SE, Ste 290, Smyrna, GA 30082.

**Section 4.3.**  *Waiver; Remedies.*

Neither failure on the part of Buyer to exercise nor delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**Section 4.4.**  *D/B/A's.*

Seller hereby acknowledges and agrees that Buyer may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transactions between Buyer and Seller, including the filing of UCC-1 financing statements and other notices or filings.

**Section 4.5.**  *Binding Effect.*

This Agreement shall be binding upon and inure to the benefit of Seller, Guarantor(s), Buyer and their respective successors and assigns, except that Seller and Guarantor(s) shall not have the right to assign or delegate any of their rights or obligations hereunder or any interest herein without the prior written consent of Buyer, which consent may be withheld in Buyer's sole discretion. Buyer may appoint or remove a Processor at its sole discretion. Buyer reserves the right to assign or delegate this Agreement or any of its rights or obligations hereunder without prior notice to, or consent of, Seller. Without limiting the generality of the foregoing, Buyer may grant a security interest in any and all of Buyer's rights and interests pursuant to this Agreement, including Buyer's rights and interests in and to the Specified Amount of Purchased Receivables, to any secured party from whom Buyer may now or hereafter obtain financing, and such secured party will be entitled to enforce Buyer's rights and interests under this Agreement, subject to and in accordance with the terms thereof. Such secured party will have no liability for any of Buyer's obligations under this Agreement.

**Section 4.6.**  *Governing Law; Jurisdiction; Service of Process.*

EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS AGREEMENT AND ALL TRANSACTIONS IT CONTEMPLATES, INCLUDING ALL ISSUES CONCERNING THE VALIDITY OF THE AGREEMENT AND ANY TRANSACTIONS IT CONTEMPLATES, THE CONSTRUCTION OF ITS TERMS, AND THE INTERPRETATION, PERFORMANCE AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF BUYER, SELLER AND GUARANTOR (S) (EACH, A "PARTY" AND COLLECTIVELY, THE "PARTIES"), SHALL BE GOVERNED BY AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF GEORGIA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAW. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES AGREE THAT, EXCEPT AS OTHERWISE PROVIDED HEREIN, THE LAWS OF THE STATE OF GEORGIA SHALL GOVERN THE ENTIRE RELATIONSHIP BETWEEN AND AMONG THE PARTIES, INCLUDING WITHOUT LIMITATION, ALL ISSUES OR CLAIMS ARISING OUT OF, RELATING TO, IN CONNECTION WITH, OR INCIDENT TO THIS AGREEMENT AND ANY TRANSACTIONS IT CONTEMPLATES, WHETHER SUCH CLAIMS ARE BASED IN TORT, CONTRACT, OR ARISE UNDER STATUTE OR IN EQUITY. AS USED HEREIN, THE PHRASE 'LAWS OF THE STATE OF GEORGIA" INCLUDES GEORGIA LAW WITH RESPECT TO, AMONG OTHER THINGS, ANY APPLICABLE STATUTE OF LIMITATIONS, LACHES, OR SIMILAR TIME- BASED DEFENSE. THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT IS MADE AND PERFORMED IN THE STATE OF GEORGIA. NOTWITHSTANDING THE FOREGOING, THE PARTIES AGREE THAT SECTIONS 1.8 AND 3.1 OF THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, SECTION 9.109(e) OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN THE STATE OF TEXAS. Seller and Guarantor(s) further irrevocably and unconditionally consent and submit to the jurisdiction of any state or federal court sitting in  Fulton or Cobb County Georgia to resolve any such, action, controversy, or proceeding of any kind (whether in contract, tort, statute, equity or otherwise) between or among the Parties, arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates.  Seller and Guarantor(s) hereby agree that any of the above-named courts shall be a convenient forum for any such suit, action, controversy, or proceeding of any kind between or among the Parties, arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates.  Seller and Guarantor(s) waive, to the fullest extent permitted by law, (i) any objection that Seller or Guarantor(s) may now or later have to the laying of venue of any suit, action, controversy, or proceeding arising out of, relating to, in connection with, or incident to this Agreement or any of the transactions it contemplates in any of the above- named courts, (ii) any objection to personal jurisdiction applying in any such court, and (iii) any claim that any such suit, action, controversy or proceeding brought in any such court has been brought in an inconvenient forum.  Seller and Guarantor(s) agree that service of process in any such suit, action, controversy, or proceeding may be served on any of them by mailing or delivering a copy of the process to any of the addresses set forth in this Agreement or any other address Seller or Guarantor(s) has provided to Buyer. Nothing set forth in this Section affects the right to serve process in any other manner permitted by law.

**Section 4.7.**  *Costs.*

**8 \*\*\* RECEIVABLES PURCHASE AND SALE AGREEMENT**

DocuSign Envelope ID: CA95B0D7-6E56-4676-A6C0-431558635727

Buyer shall be entitled to receive from Seller and Guarantor(s), and Seller and Guarantor(s) shall pay (a) all reasonable costs associated with a Default and the enforcement thereof, including court costs and attorneys' fees, and (b) a fee of $25.00 (or, if less, the maximum amount permitted by applicable law) for each rejected or dishonored check, ACH debit, or wire transfer withdrawal, as the case may be, it being understood that Buyer has the right to receive such fee for each business day on which Buyer or its designee attempted and was unable to debit or otherwise withdraw from the accounts of Seller or Guarantor(s) (including the Account), as authorized herein, the total amount Buyer was entitled to receive hereunder as of such date.

**Section 4.8.** *Indemnified Amounts.*
In the event of a Default, Seller shall assume liability for and hereby agrees to indemnify, protect, and hold harmless Buyer, its affiliates, and its and their officers, directors, employees, agents, representatives and assignees (collectively referred to as "Indemnified Parties"), from and against any and all liabilities, claims, losses, obligations, damages, penalties, suits, actions, controversies, or proceedings of any kind, imposed upon, incurred by, or asserted against any of the Indemnified Parties, in any way arising from, in connection with, relating to, or incident to such Default (collectively referred to as "Indemnified Amounts"), including the payment of all costs and expenses of every kind for the enforcement of Buyer's rights and remedies hereunder, including reasonable attorneys' fees, costs of any trial, appellate court proceeding, administrative proceeding, or any negotiations or consultations with respect to any such Default. Such Indemnified Amounts will bear interest at the highest rate of interest permitted by applicable law until paid.

**Section 4.9.** *Term and Survival.*
This Agreement shall continue in full force and effect until all obligations hereunder have been satisfied in full; provided, however, that Sections 1.3, 1.4, 3.3, 3.4, 3.8, 3.9, 3.10, 4.3, 4.5, 4.6, 4.7, 4.8, 4.9, 4.14 and 4.15 shall survive indefinitely.

**Section 4.10.** *Severability.*
In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 4.11.** *Counterparts; Facsimile and Electronic Signatures.*
This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile signatures shall be deemed to be original signatures and each Party hereto may rely on a facsimile signature or electronic signature as an original for purposes of enforcing this Agreement.

**Section 4.12.** *Entire Agreement.*
This Agreement contains the entire agreement and understanding among Seller, Guarantors and Buyer and supersedes all prior agreements and understandings, whether oral or in writing, relating to the subject matter hereof unless otherwise specifically reaffirmed or restated herein. Seller and Guarantors each acknowledge and agree that he, she or it is not relying on any representations not specifically embodied in this Agreement.

**Section 4.13.** *Addendums.*
To the extent necessary, the Parties may execute one or more addendums ("Addendums") to further facilitate the promises and obligations made in this Agreement. To the extent the language in the Addendums contradicts, is ambiguous, or otherwise violates this Agreement, this Agreement controls, unless such language is an express modification of this Agreement as allowed.

**Section 4.14.** *Jury Trial Waiver.*
THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION, CONTROVERSY OR PROCEEDING OF ANY KIND ON ANY MATTER ARISING OUT OF, RELATING TO, IN CONNECTION WITH, OR INCIDENT TO THIS AGREEMENT OR ANY TRANSACTIONS IT CONTEMPLATES OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**Section 4.15.** *Class Action Waiver.*
The Parties acknowledge and agree that the amounts at issue in this transaction and any disputes that may arise between them are large enough to justify dispute resolution on an individual basis. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW.

9 *** **RECEIVABLES PURCHASE AND SALE AGREEMENT**

# PLAINTIFF'S EXHIBIT B



## AQUINA™ Disclosure Questionnaire

Please answer the following questions and sign at the designated line below.

Does your company or any of the owners have any federal, state or tax liabilities or liens outstanding or expected to be filed?

> no

If yes, amount ($):

> 0

Does your company have any loans, factoring agreements, merchant cash advance or other debt outstanding?

> no

If yes, amount ($):

> 0

Has your company or any of the owners filed for bankruptcy protection or similar proceedings?

> no

Has your practice or any of the owners been subject to Medicare, Medicaid or insurance company audit or in the past?

> no

Has your practice or any of the owners been investigated by any entity for concern regarding your billing practices or potential fraud at any time?

> no

Is your practice or any of the owners involved in any current or potential litigation?

> no

Please list all the officers with 20% of greater ownership in the entity.

> none

Jane Quintana

Jane Quintana, D.M.D., P.A.